IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 29, 2013

**STATE OF TENNESSEE v. QUINZELL GRASTY**

**Appeal from the Criminal Court for Hamilton County**
**No. 272582     Don W. Poole, Judge**

_____

**No. E2012-00141-CCA-R3-CD - Filed April 10, 2013**

_____

A Hamilton County jury convicted appellant, Quinzell Grasty, of felony murder, second degree murder, attempted especially aggravated robbery, and aggravated burglary. The trial court merged the second degree murder conviction into the felony murder conviction and sentenced appellant to serve a life sentence for felony murder. The trial court also sentenced appellant to serve eight years for attempted especially aggravated robbery and three years for aggravated burglary, to be served concurrently in the Tennessee Department of Correction. On appeal, appellant argues that the trial court erred by denying his motion to suppress his statements to police, by admitting photographs of the victim and a recording of the 9-1-1 call, by failing to redact references to appellant's gang affiliation from his statement, and by admitting demonstrative evidence in the form of a shotgun purported to be similar to the weapon used in the murder. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Donna Miller (on appeal) and Robin R. Flores (at trial), Chattanooga, Tennessee, for the appellant, Quinzell Grasty.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Smith, Associate Deputy Attorney General; William H. Cox, III, District Attorney General; and Cameron Williams and Lance Pope, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Facts

This case concerns the April 16, 2009, shooting death of Steven Matthew Coyle during a home invasion burglary and attempted robbery. A Hamilton County grand jury indicted appellant and a co-defendant for first degree murder, felony murder, attempted especially aggravated robbery, and aggravated burglary. The trial court severed the trials of appellant and his co-defendant and held appellant's trial from October 5 through 8, 2009.

At appellant's trial, Chattanooga Police Officer Annette Butler testified that on April 16, 2009, she was dispatched to a residence on Standifer Gap Road in response to a shooting. When she arrived at the location, a man directed her to the victim's bedroom. Officer Butler found the victim lying on the floor and a female kneeling beside him. Officer Butler checked the victim's pulse and determined that he was deceased. Over appellant's objection, the State introduced photographs of the deceased victim as Officer Butler found him. Officer Butler testified that the back door of the residence had been "kicked in."

Sarah Gill testified that she had been dating the victim for six to eight months prior to his death. She had been living with him at the Standifer Gap residence since December 2008, along with his roommate, Samuel Eldridge; Mr. Eldridge's son; and occasionally Mr. Eldridge's fiancee. Ms. Gill testified that she and the victim were awakened by a "crashing sound" on April 16, 2009. She thought something had fallen, but the victim believed "it was somebody breaking in." The victim got out of bed, picked up a pocket knife, and approached the bedroom door. As he started to open the door, Ms. Gill "heard [a shot] and saw blood." At first she thought someone was playing a joke on them, but when she saw the victim's wound, she called 9-1-1 from her cellular telephone. The State played the recording of Ms. Gill's 9-1-1 call for the jury. Ms. Gill called Mr. Eldridge from another telephone while she spoke with the 9-1-1 operator, and he arrived shortly before the police. Ms. Gill testified that she learned shortly after moving in that Mr. Eldridge sold hydrocodone and marijuana from the residence. She knew that he had several guns in the house.

Samuel Eldridge testified that he received a telephone call from Ms. Gill at 9:16 a.m. on April 16, 2009, while he was at work. He immediately went home and went straight to the victim's bedroom. Mr. Eldridge found the victim lying on the floor next to his bed. He testified that the victim was already deceased. Mr. Eldridge talked to the 9-1-1 operator. He testified that he "was emotionally disturbed" during that conversation. The police arrived at the house thirty-five to forty seconds after he arrived. Mr. Eldridge testified that he had never seen appellant prior to the trial. He said that the Sunday before the victim's murder,

he sold marijuana to a person named Mark at the Standifer Gap residence. Mr. Eldridge said that he had two handguns and an SKS rifle and that Mark saw the SKS rifle.

On cross-examination, Mr. Eldridge agreed that he had told the police a person named Thaddeus Watson, who had robbed him in the past, might have been responsible. He said that the police did not find any drugs at the residence and that he did not try to arrive before the police to hide his drugs. Mr. Eldridge agreed that he was not prosecuted on drug or weapons charges after the victim's death.

Cordarious Holloway testified that in April 2009, Trammel Poindexter, a friend of his since eighth grade, called him for a ride one day. Mr. Poindexter also asked him to pick up appellant, "Mike," and a third individual. Mr. Holloway did not know appellant prior to that day. Mr. Poindexter and the other men gave Mr. Holloway directions to an area near the Rainbow Creek apartment complex. He recalled that they drove past a particular house three to four times because either his passengers did not know where they were going or he missed the directions because he was sending text messages while driving. Mr. Holloway parked at the Rainbow Creek apartments and told his passengers that they "need[ed] to find out what [they were] going to do." Someone exited the vehicle and came back while he was parked, but Mr. Holloway did not know which passenger. The other men told Mr. Holloway to drive back down the street. He complied, and they asked him to turn around because they "passed it again." Mr. Holloway pulled over, and he told Mr. Poindexter to drive his car and take care of whatever they were planning to do while he walked to a place to use the restroom. Mr. Poindexter and the other passengers drove away, and Mr. Holloway walked down the street. Eventually, Mr. Poindexter and the others returned to pick him up. Mr. Poindexter continued to drive the car, and he took Mr. Holloway home. Mr. Holloway did not notice anything different about the demeanor of any of the passengers during the drive, including appellant. He said that he did not "hear any conversation about hitting a lick or a robbery."

Mr. Holloway testified that later that day, he heard about a murder near Rainbow Creek on the news. He had also heard "that some stuff was on the street said [sic] about me being out there at that time." Mr. Holloway approached a police officer at a McDonald's restaurant to tell him that he had been in the area of the murder earlier in the day. The officer had him talk with a detective. Mr. Holloway talked with one detective and then talked with Detective James Holloway.[1] At the behest of the police, Mr. Holloway called Mr. Poindexter to ask whether Mr. Poindexter and the others had done anything while he was not with them. Mr. Holloway also talked to Mr. Poindexter in person while wearing a recording device.

---

[1] Detective Holloway is not related to Cordarious Holloway.

-3-

Jonathan Mance, a former Chattanooga Police officer with the crime scene office, testified that on April 27, 2009, he collected DNA samples using buccal swabs from appellant, Cordarious Holloway, Trammel Poindexter, Michael Adams, and Avery Davis.

Chattanooga Police Detective James Holloway testified that he was the lead investigator for the Coyle homicide. He responded to the crime scene on April 16, 2009. As he walked through the scene, he observed that the rear door appeared to have been forced open. He observed the victim "[l]ying in the floor just inside the doorway of his bedroom." Detective Holloway also interviewed Sarah Gill and Samuel Eldridge and canvassed the neighborhood for leads.

At approximately 7:30 p.m. on April 16th, Detective Holloway "received a phone call . . . from the police dispatch, stating that an Officer Tyrone Williams requested [he] call him." He called Officer Williams, who told him that Cordarious Holloway had approached him and said "that he [thought] he may have transported the suspects out to the scene." Detective Holloway asked Investigator Carl Fields to go talk to Cordarious Holloway and Officer Williams. Eventually, Detective Holloway met Cordarious Holloway at the police service center and interviewed him at approximately 10:00 p.m. Cordarious Holloway gave Detective Holloway names and nicknames of the people who might have been involved in the victim's death.

The police recorded telephone conversations between Cordarious Holloway and Trammel Poindexter, but they did not "get any viable information" from those conversations. On April 27, 2009, the police placed a recording device on Cordarious Holloway and had him speak to Mr. Poindexter in person. Based on that conversation, Detective Holloway developed appellant as a suspect. The same day, Detective Holloway asked the police department's fugitive unit to bring Trammel Poindexter, appellant, and Michael Adams to the police service center. Detective Holloway began interviewing Trammel Poindexter at 6:59 p.m. He interviewed Michael Adams at 8:18 p.m.

According to Detective Holloway, the fugitive unit located appellant at approximately "19:26 or 19:30 on the 27th." The fugitive unit brought appellant to the police service center. Detective Holloway informed appellant of his rights, and appellant waived his rights and agreed to speak with him. During the trial, the State played an audio recording of appellant's statement to police. After telling several different versions of events, appellant told Detective Holloway that several weeks before the murder, a white man named "Mark" told him about a person named "Sam," who would be a good target to rob because he had lots of drugs, money, and guns. On April 16th, appellant suggested to Trammel Poindexter, Michael Adams, and others that they should burglarize Sam's house. They all rode together in a small, white car to Sam's house. Michael Adams kicked in the back door. Appellant had a

-4-

sawed-off shotgun that had been stored in a black backpack. He described the shotgun as having one barrel and as being sixteen to eighteen inches in length. He also described how the shotgun opened. Appellant said that he was checking to see if anyone was in the child's bedroom when the victim opened a door behind him. Appellant "was just turning around, . . . and the gun went off." He said that he did not "mean to kill the man" and that he wished he could tell the family that he was sorry. Appellant said that he did not know what happened to the gun.

On May 6, 2009, appellant contacted Detective Holloway through the correctional center's employees. Detective Holloway had appellant brought to the police service center and interviewed him again after appellant signed a second rights waiver form. The State also played an audio recording of appellant's second statement. In his statement, appellant said that he had heard that the others involved were planning to let him take all of the blame. He told Detective Holloway that Michael Adams shot the victim. Michael Adams was under house arrest at the time, so he asked appellant to "take the charge" for him. Appellant said that he had been in a gang but had "dropped [his] flag" because the other gang members had not supported him after he was arrested. He also said that he had been threatened by various people because he told the police that Michael Adams was involved in the burglary.

On cross-examination, Detective Holloway testified that he asked the fugitive unit to bring appellant to the police service center because Trammel Poindexter named appellant as the shooter during Poindexter's conversation with Cordarious Holloway. When Detective Holloway interviewed Mr. Poindexter, he identified appellant as one of the individuals "who entered the residence and who had subsequently talked about the shooting and that he had done the shooting." Detective Holloway agreed that the police discovered a mixture of three different DNA profiles on a backpack found at the crime scene, and neither Trammel Poindexter nor appellant could be excluded as contributors of the DNA.

Chattanooga Police Officer Brian Russell of the crime scene unit testified that he participated in the initial walk-through of the crime scene at 7616 Standifer Gap Road on April 16, 2009. He recalled seeing a black backpack in the living room, but no one collected it. On May 7, 2009, Samuel Eldridge's mother brought the backpack to the police service center because she found it while cleaning the residence and did not know to whom it belonged.

Chattanooga Police Investigator Greg Mardis testified that he responded to the crime scene at 7616 Standifer Gap Road on April 16, 2009. He identified photographs of the crime scene and noted the location of shotgun wadding and a pocketknife in relation to the victim. He collected the shotgun wadding and pocketknife as evidence.

The trial court accepted Tennessee Bureau of Investigation ("TBI") Agent Mark Dunlap as an expert in DNA and serology. Agent Dunlap tested six areas of the black backpack provided to him by the Chattanooga Police Department for DNA. He found DNA from at least four individuals and concluded that Trammel Poindexter and appellant could not be excluded as contributors. On cross-examination, Agent Dunlap testified that Michael Adams and Cordarious Holloway could be excluded as contributors to the DNA on the backpack.

The trial court accepted TBI Agent Steven Scott as an expert in firearms. The Chattanooga Police Department sent him shot shell wadding in association with this case, and he concluded that the wadding was consistent with a twelve-gauge, Winchester AA type wadding. Agent Scott also received "[eighteen] fired lead birdshot pellets" that he determined to be "number seven and a half birdshot" based on "size and weight specifications." Agent Scott explained that when pellets leave a shotgun, "they are together in one mass." From a twelve-gauge shotgun, the pellets begin to spread into a cone-shaped pattern after traveling five to seven feet from the muzzle of the gun. For demonstration purposes, Agent Scott produced a shotgun from the TBI collection that he had modified based on appellant's description given during his first statement to the police. He explained that the hammer would have to be cocked on the weapon to allow a person to pull the trigger. Agent Scott demonstrated for the jury that the sawed-off shotgun could be placed inside the black backpack previously entered as an exhibit.

Dr. James Kenneth Metcalfe, a pathologist at the Hamilton County Medical Examiner's Office, testified that the victim died from a gunshot wound to the head. He described the wound as having "a central cluster in which [there was] a hole and then some small holes around the margin on the skin." He estimated that there were 230 pellets inside the victim's skull. Dr. Metcalfe removed eighteen pellets as a sample. He opined that no medical intervention would have prevented the victim from dying.

Following the close of proof and deliberations, the jury convicted appellant of felony murder, the lesser-included charge of second degree murder, attempted especially aggravated robbery, and aggravated burglary. The trial court merged the second degree murder conviction into the felony murder conviction and sentenced appellant as a violent offender to serve a life sentence for felony murder. The trial court sentenced appellant as a Range I, standard offender to serve eight years for attempted especially aggravated robbery and three years for aggravated burglary, to be served concurrently in the Tennessee Department of Correction. The trial court denied appellant's motion for new trial, and this appeal follows.

## II. Analysis

### A. Motion to Suppress

For his first issue, appellant contends that the trial court erred by denying his motion to suppress his statements to the police as fruit of an illegal warrantless arrest. The State responds that appellant has waived this issue on appeal by failing to include the transcript of the motion hearing in the appellate record.

The record evinces that appellant filed a motion to suppress his statements. The trial court held a hearing on the motion to suppress and denied the motion after finding that the police had probable cause to arrest appellant. However, appellant failed to include in the appellate record a transcript of the hearing on the motion to suppress. The appellant has the duty to ensure that the record on appeal "conveys a fair, accurate[,] and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993). Generally, the failure to include the transcript of a suppression hearing will result in a waiver of the issue. *See* Tenn. R. App. P. 24(b); *Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). Thus, the appellant has waived this issue on appeal. However, based on the scant record before us, it appears that the trial court correctly denied appellant's motion to suppress.

After an evidentiary hearing on the merits of a motion to suppress, we attribute to the factual findings of the trial court the weight of a jury verdict. *State v. Makoka*, 885 S.W.2d 366, 371 (Tenn. Crim. App. 1994). We review de novo the trial court's legal conclusions denying a motion to suppress. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008) (citations omitted). In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id.*; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

We begin with the proposition that "[b]oth the state and federal constitutions protect against unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression." *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). Our supreme court has recognized three categories of police interactions with private citizens: "(1) a full-scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing; and (3) a brief police-citizen encounter, requiring no objective justification." *Id.* (citing *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000)). "'While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not.'" *Id.* (quoting *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006)).

An arrest supported by probable cause is an exception to the warrant requirement. *Id.* (citing *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009)); *see Brown v. Illinois*, 422 U.S. 590, 598 (1975). "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *Echols*, 382 SW.3d at 277-78 (quoting *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997)); *see Beck v. Ohio*, 379 U.S. 89, 91(1964). "'Probable cause must be more than a mere suspicion.'" *Echols*, 382 S.W.3d at 278 (quoting *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005). However, probable cause "'deal[s] with probabilities[,] . . . not technical[ities,] . . . the factual and practical considerations of everyday life on which reasonable and prudent [persons] . . . act.'" *Id.* (quoting *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008)); *see Brinegar v. United States*, 338 U.S. 160, 175 (1949). Moreover, a determination of probable cause encompasses the accumulation of information known to law enforcement collectively if a sufficient nexus of communication exists between the arresting officer and a fellow officer with pertinent knowledge. *Echols*, 382 S.W.3d at 278 (citation omitted). "If the arresting officers rely in part on information from an informant from the criminal milieu, they must be able to demonstrate that the informant (1) has a basis of knowledge and (2) is credible or his information is reliable." *State v. Lewis*, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000).

In this case, there is little information in the record regarding the issues underlying appellant's motion to suppress other than the trial court's order denying the motion. The trial court found that the police arrested appellant without a warrant but that they had probable cause for the arrest. According to the trial court's findings of facts, Detective Holloway testified at the motion hearing that Cordarious Holloway reported to the police "that there had been a plan to commit burglary and [that] he drove his vehicle with five or six occupants by the crime scene several times." Cordarious Holloway led the police to Trammel Poindexter, who named appellant as the shooter twice, once when he did not know that the police were recording him and again when the police interviewed him. Based on this

information, Detective Holloway had the fugitive unit bring appellant to the police service center. The trial court found that the police had probable cause to arrest appellant at the time they took him into custody. The trial court further found that "the arrest was based on information from two of three or more co-conspirators" who had a personal basis of knowledge of appellant's participation in the burglary, "even if their bas[e]s of knowledge of his precise role in the death of the victim was not" personal, and whose "accounts were credible, not being anonymous and being self-inculpatory, consistent over time, and consistent with the offenses, the defendant's admission . . . , and . . . one another."

On appeal, appellant argues that the police did not have probable cause to arrest him, analogizing his case to *State v. Courtney Bishop*, No. W2010-01207-CCA-R3-CD, 2012 WL 938969, at *9-10 (Tenn. Crim. App. March 14, 2012), *perm app. granted* (Tenn. Aug. 15, 2012). In *Bishop*, the police detained a suspect who implicated himself as participating in a plan to rob the victim but indicated that Bishop was the person who actually robbed and killed the victim. *Id*. at *9. This court determined that the police did not have probable cause to arrest appellant because the suspect's statement was "an entirely self-serving and only partially inculpatory statement," and there was no corroboration for the statement. *Id*. at *9-10. The key difference between *Bishop* and the case under review is that Trammel Poindexter implicated appellant when he had no knowledge that the police were recording him, thus making his statement far more credible than the suspect's in *Bishop*.

Appellant also takes issue with the inconsistency between Cordarious Holloway's trial testimony and pretrial statements to the police. At trial, Cordarious Holloway denied any knowledge of a burglary, contrary to Detective Holloway's testimony at the motion hearing. However, whether the police had probable cause is determined by their knowledge *at the time of arrest*, and nothing in the record preponderates against the trial court's finding that Cordarious Holloway indicated to the police prior to appellant's arrest that he was aware of the burglary plan.

Based on the limited record before this court, we conclude that the trial court did not err by denying appellant's suppression motion. Detective Holloway testified at trial and at the motion hearing that information from Cordarious Holloway led the police to Trammel Poindexter, who named appellant as the shooter when, unbeknownst to him, the police were recording his conversation. The police had credible information from criminal informants with personal knowledge of appellant's participation in the burglary that led to the victim's death; therefore, the police had probable cause to arrest appellant. Appellant is without relief as to this issue.

## B. Admissibility of Evidence (Appellant's Issues 2 & 3)

The determination of whether evidence is admissible at trial is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *State v. Dellinger*, 79 S.W.3d 458, 485 (Tenn. 2002); *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence is admissible unless specifically excepted by constitution, statute, rules of evidence, or rules of general application. Tenn. R. Evid. 402. One such exception sets forth that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

### 1. Photographs

Appellant argues that the trial court erred by admitting photographs of the victim and the crime scene when the probative value of the photographs was substantially outweighed by the danger of unfair prejudicial effect. The State responds that the trial court properly admitted the photographs as they were not particularly gruesome and were corroborative of witnesses' testimonies.

Tennessee Rules of Evidence 401, 402, and 403 govern the admissibility of the photographs in this case. *See State v. Banks*, 564 S.W.2d 947, 949-51 (Tenn. 1978). First, a witness with knowledge of the facts must verify and authenticate a photograph before it can be admitted into evidence. *Id.* at 949. Next, a trial court must first determine whether the photograph is relevant. *Id*; s*ee* Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. If the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," it is relevant. Tenn. R. Evid. 401. Once it determines that a photograph is relevant, the trial court must then determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Tenn. R. Evid. 403, Adv. Comm. Note).

> A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need

for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*State v. Leach*, 148 S.W.3d 42, 63 (Tenn. 2004) (citing *Banks*, 564 S.W.2d at 951).

The decision whether to admit the photographs rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dubose*, 953 S.W.2d 649, 653 (Tenn. 1997); *State v. Stinnet*, 958 S.W.2d 329, 331 (Tenn. 1997). Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See Banks*, 564 S.W.2d at 949.

Photographs of a corpse must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. *Id.* at 951. "[P]hotographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *Leach*, 148 S.W.3d at 63 (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)). "The traditional rule is said to be that photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Banks*, 564 S.W.2d at 950-51.

In this case, appellant objected to the admission of the photographs showing the victim's body, a close-up of the victim's pocketknife, and blood spatters. The trial court found that the photographs of the victim's body were not gruesome because there was not an excessive amount of blood and the victim's wound was covered. The trial court further found that the photographs were "probative to show what the body was like at the residence" and that they were not "unduly prejudicial." The trial court found that the photograph of the pocketknife was probative to show its location, even with appellant's stipulation as to the location of the pocketknife, and that the photographs of the blood spatters were corroborative evidence. The trial court found no prejudicial value in those photographs. Having reviewed the photographs and the witnesses' testimony, we conclude that the trial court did not abuse its discretion in admitting the photographs. None of the photographs are particularly gruesome, and all are illustrative of the witnesses' testimony. In addition, "the admissibility of photographic evidence does not depend upon the defendant's offer to stipulate to the facts depicted therein." *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000). Therefore, appellant is not entitled to relief on this issue.

## 2.  9-1-1 Recording

Appellant contends that the trial court erred by admitting the recording of Sarah Gill's 9-1-1 call, arguing that the danger of unfair prejudice substantially outweighed the prejudicial value.[2]  The trial court ruled that the recording had "probative value as to what was going on at the scene at the time" and was "not unduly prejudicial."  The 9-1-1 call in question occurred within seconds of the victim's shooting.  Ms. Gill is heard telling the operator that a noise had awakened her and her boyfriend and that her boyfriend had left the bed to find out what happened.  She told the operator that someone shot her boyfriend in the face and ran away.  The victim was still alive when Ms. Gill called 9-1-1.  Toward the end of the recording, Samuel Eldridge can be heard speaking to Ms. Gill, the 9-1-1 operator, and the police, who arrived moments after he did.  We conclude that the trial court did not abuse its discretion in admitting the recording because the recording is highly probative of what actually happened at the crime scene based on its temporal proximity to the shooting.

## 3.  Gang Affiliation

For the first time on appeal, appellant argues that under Tennessee Rule of Evidence 404(b), the trial court erred by failing to redact references to gang affiliation from appellant's second statement to police because such references amounted to inadmissible character evidence.  At trial, appellant objected to the admission of his second statement under Tennessee Rule of Evidence 403.  The trial court specifically told appellant's counsel that he was entitled to a hearing under Rule 404(b), but counsel maintained that he was objecting under Rule 403.  Tennessee Rule of Appellate Procedure 36(b) states, "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."  Therefore, appellant has waived his argument that the trial court impermissibly admitted appellant's statement under Rule 404(b).  Furthermore, we conclude that the statement was properly admitted under Rule 403 because the appellant's references to his gang affiliation, specifically that he had disassociated himself from his gang, were highly probative of his rationale for recanting his confession and because appellant has not shown that the probative value of the statement was substantially outweighed by the danger of unfair prejudice.

---

[2]  Petitioner does not contest the admission of the recording as an excited utterance under Tennessee Rule of Evidence 803(2).

C. Demonstrative Evidence

Appellant argues that the trial court abused its discretion by allowing TBI Agent Steven Scott to use a shotgun obtained from the TBI's collection and modified by him in a demonstration of how a shotgun is broken and loaded and how a sawed-off shotgun might be concealed in a backpack.

At trial, the trial court accepted Agent Scott as a firearms expert. He demonstrated to the court how a sawed-off shotgun is used and concealed. He testified that the shotgun came from the TBI collection, and he modified it based on a transcript of appellant's statement. In his statement, appellant agreed with the detective conducting the interview that the shotgun he used was sixteen to eighteen inches in length, and he described how the shotgun opened. He further described it as having one barrel. The trial court found that the shotgun would assist the trier of fact in understanding Agent Scott's testimony. The trial court further found that it was relevant to the elements of intent and premeditation and to show how a weapon could be concealed in a backpack. The trial court admitted the shotgun for demonstrative purposes only and instructed the jury that the shotgun was not used in the shooting and was to be used only for demonstrative purposes. "The admission of demonstrative evidence is within the sound discretion of the trial court." *State v. Douglas Marshall Mathis*, M2002-02291-CCA-R3-CD, 2004 WL 392710, at *10 (Tenn. Crim. App. Mar. 3, 2004) (citations omitted). In our view, the trial court did not abuse its discretion by admitting the shotgun for demonstrative purposes. Furthermore, the trial court's instructions to the jury rendered any error harmless, as jurors are presumed to follow the trial court's instructions. *Id.* (citing Tenn. R. App. P. 36(b); *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994); *State v. Woods*, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990)).

**CONCLUSION**

Based on our review of the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE